RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
ALEXANDRIA, LOUISIANA
DATE 12 23 09
BY _____

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO. 1:09-cr-00040 |
| -vs- | JUDGE DRELL |
| RUSSELL S. JENNINGS | MAGISTRATE JUDGE KIRK |

## R U L I N G

Before the Court is a Motion to Withdraw Plea of Guilty filed by the defendant, Mr. Russell S. Jennings ("Mr. Jennings"), on October 16, 2009. (Doc. 43). Mr. Jennings also filed a Second Motion to Withdraw Plea of Guilty on October 28, 2009. (Doc. 51). For the reasons described more fully below, and after careful consideration of all of the facts and circumstances of this case, both motions are hereby **DENIED**.

Disposition will follow by a separate order.

## I.   Background

Mr. Jennings was formally indicted on February 25, 2009, on two counts. (Doc. 2). The first count charges Mr. Jennings, under 26 U.S.C. § 5861(d)[1], with knowingly possessing a 16 gauge Springfield shotgun (with a shortened or "sawed-off" barrel) which was not registered to him in the National Firearms Registration and Transfer Record. Count two involves forfeiture of the firearm and ammunition under 18 U.S.C.

---

[1] This provision states that "[i]t shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). The indictment also references 26 U.S.C. § 5841, which provides for the registration of firearms, and 26 U.S.C. § 5871, a penalty provision.

§ 924(d)(1).[2]

On April 20, 2009, Mr. Jennings appeared before the magistrate judge and entered pleas of not guilty to both counts. (Doc. 14). Following the hearing, a public defender was also appointed to represent him. Magistrate Judge James D. Kirk signed a detention order on April 23, 2009, on the grounds that Mr. Jennings presented a serious risk of danger to other persons in the community. (Doc. 20).

Shortly thereafter, Mr. Jennings requested a change of plea hearing, and pled guilty to Count 1 of the indictment on May 12, 2009. (Doc. 28). He signed a plea agreement which stated that if the plea was overturned at any point in the future, the indictment would be automatically reinstated. (Doc. 29, p. 1). A sentencing hearing for Mr. Jennings was first rescheduled by the Court (Doc. 30), and then continued until November 5, 2009 at Mr. Jennings's request (Doc. 42).

Pending now before the Court is the defendant's motion to withdraw his guilty plea filed on October 16, 2009. (Doc. 43). The motion rests on two grounds. First, Mr. Jennings claims "actual innocence," stating that he had no reason to believe that the shotgun met the definition of a "firearm" contained in 26 U.S.C. § 5845(a), because he believed that the firearm was a non-functioning antique.[3] Secondly, he asserts that

---

[2] Forfeiture is not an issue in this motion - the defendant readily agreed to forfeit the weapon and ammunition. (Doc. 48, p. 15). The weapon was described by the case agent as a "double-barrelled [sic] Springfield shotgun" with "a barrel length of 11 3/4 inches." (Doc. 48, p. 22).

[3] "The term 'firearm' means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length . . . (5) any other weapon, as defined in subsection (e) . . . ." 26 U.S.C. § 5845(a). Mr. Jennings does not argue that the shotgun would fall outside of this definition; rather, he claims that the shotgun is an "antique," which would be exempted from this definition.

2

the warrantless search of his home which revealed the firearm exceeded the permissible scope of a search incident to an arrest.  In the defendant's Second Motion to Withdraw Plea of Guilty (Doc. 51), filed on October 28, 2009, the defendant claims that his original attorney ("public defender") was ineffective in failing to file, or advise him of the viability of, a motion to suppress the shotgun.  This, he claims, rendered his guilty plea involuntary.

The Court held a hearing on the defendant's motions on November 5, 2009.  Mr. Jennings was represented by a new attorney at the hearing.  The Court heard arguments from counsel, and testimony from a number of witnesses, including the defendant, as to the events leading up to the seizure of the disputed shotgun and the defendant's subsequent guilty plea.  After reviewing the record and the testimony obtained at the hearing, the Court is now prepared to rule upon each of the defendant's motions.

## II.  Law and Analysis

### A.  General Standard for a Motion to Withdraw a Guilty Plea

Federal Rule of Criminal Procedure 11 provides, in relevant part, as follows: "A defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal."  Fed. R. Crim. P. 11(d)(2)(B).  A defendant *does not* have an absolute right to withdraw a guilty plea after it has been accepted by the district

3

court.  United States v. Brewster, 137 F.3d 853, 857 (5th Cir. 1998).[4]  Rather, under

settled Fifth Circuit jurisprudence, the Court must consider seven factors in

determining whether the defendant has offered "fair and just reason" for

withdrawing his guilty plea:

> (1) whether or not the defendant has asserted his innocence; (2)
> whether or not the government would suffer prejudice if the withdrawal
> motion were granted; (3) whether or not the defendant has delayed in
> filing his withdrawal motion; (4) whether or not the withdrawal would
> substantially inconvenience the court; (5) whether or not close
> assistance of counsel was available; (6) whether or not the original plea
> was knowing and voluntary; and (7) whether or not the withdrawal
> would waste judicial resources; and, as applicable, the reason why
> defenses advanced later were not proffered at the time of the original
> pleading, or the reasons why a defendant delayed in making his
> withdrawal motion.

United States v. Carr, 740 F.2d 339, 343-44 (5th Cir. 1984); accord United States v.

McKnight, 570 F.3d 641, 645-46 (5th Cir. 2009).  "The Carr factors are considered for

the totality of the circumstances [with no single factor being dispositive], and the

district court is not required to make a finding as to each individual factor."

McKnight, 570 F.3d at 646.  Moreover, trial courts retain broad discretion in deciding

whether to allow a defendant to withdraw a guilty plea.  Carr, 740 F.2d at 344.  The

burden of establishing a "fair and just reason" for withdrawing a guilty plea rests

with the defendant.  United States v. Powell, 354 F.3d 362, 370 (5th Cir. 2003).

**B.    Relevant Carr Factors**

Although a number of other issues were presented by this motion, and must

---

[4] By contrast, the defendant *does* have an absolute right to withdraw a guilty plea *before the court accepts it* under Fed. R. Crim. P. 11(d)(1).  United States v. Arami, 536 F.3d 479, 482-83 (5th Cir. 2008).

be addressed before we reach a final determination, it is nonetheless useful to render our findings under the relevant <u>Carr</u> factors at the outset.[5]  Intervening considerations are discussed in sections to follow.

We first note that the defendant has been inconsistent in his assertions of innocence.  Mr. Jennings's first claimed to be innocent, but less than one month later, he plead guilty to the indictment, and accepted a plea agreement.  Both of Mr. Jennings's pending motions now contend that he is innocent of the crime charged.  But as we will discuss more fully below, his present assertions of innocence follow a knowing and voluntary plea made in open court with the close advice of counsel, as contemplated by the fifth and sixth <u>Carr</u> factors, and therefore, may be given less credibility by the Court at this point.  <u>McKnight</u>, 570 F.3d at 646.  Any concerns of strategy that played into Mr. Jennings's conflicting assertions are likewise unhelpful to him at this stage: "Withdrawal is permitted for pleas unknowingly made; '[t]he purpose is not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty.'"  <u>United States v. Washington</u>, 480 F.3d 309, 317 (5th Cir. 2007).

The third <u>Carr</u> factor concerns whether the defendant has delayed in filing his motion to withdraw the guilty plea.  <u>Carr</u>, 740 F.2d at 344.  Mr. Jennings entered a guilty plea on May 12, 2009, and filed a motion to withdraw that plea on October 16,

---

[5]  The second and fourth <u>Carr</u> factors are easily grouped in this case, because both present only tangential concerns, and neither has been extensively argued in the case.  We note simply that at least some prejudice to the government and inconvenience to the Court would result from allowing Mr. Jennings to withdraw his plea.  Moreover, under the seventh <u>Carr</u> factor, judicial resources would be wasted to some extent by granting the motion.  The Court has now conducted three hearings related to Mr. Jennings's plea in this case, an investment of resources that is unusual under the circumstances.

2009.  This constitutes a delay of approximately five months between the plea and the instant motion.

Significant delays of time between a defendant's guilty plea and a motion to withdraw that plea must be carefully analyzed, and must weigh against a withdrawal motion.  See United States v. Rodriguez, 306 F. App'x 135, 138 (5th Cir. 2009) (affirming a district court's denial of the defendant's motion to withdraw a guilty plea, filed nearly one year after the plea and just days before sentencing, in part because "[t]his court carefully scrutinizes 'eleventh hour' assertions of innocence").  The length of time that Mr. Jennings delayed was well in excess of time periods which the Fifth Circuit has found excessive.  See London, 558 F.3d at 563-64 (six weeks); United States v. Thomas, 13 F.3d 151, 153 (5th Cir.1994) (six weeks); Carr, 740 F.2d at 345 (22 days).  This factor, then, will necessarily militate against granting Mr. Jennings's motion to withdraw his guilty plea.  See generally United States v. Lampazianie, 251 F.3d 519, 524-25 (5th Cir. 2001) (allowing the "district court . . . to discount [the defendant's] belated assertions of innocence and to weigh the seven-month delay in denying [the defendant's] motion").[6]

While the remainder of our discussion deviates from the list of factors in Carr, the issues addressed by the court in Carr and contained in the factors will nonetheless reappear throughout this analysis.

**C.    Actual Innocence**

---

[6]  The defendant, on the other hand, argues that the delay was caused by his incarceration, his efforts to retain new counsel, and new counsel's efforts to prepare the motion.  (Doc. 51, p. 4).  We do not find these justifications either unique or convincing; rather, they are issues that most defendants, and newly-hired attorneys, may face in similar circumstances.

Mr. Jennings claims "actual innocence" as a basis of "fair and just reason" to withdraw his guilty plea.  However, when a defendant has previously admitted to the elements of the offense, the district court is not required to give significant weight to a defendant's contravening claims in a Rule 11(d) motion, "'[b]ecause solemn declarations in open court carry a strong presumption of verity.'" McKnight, 570 F.3d at 646 (quoting Lampazianie, 251 F.3d at 524).  Additionally, a bald assertion of innocence is unavailing; the defendant must offer some support for his claim of innocence in order to withdraw his plea.  See United States v. London, 568 F.3d 553, 562-64 (5th Cir. 2009); see also United States v. Felice, 272 F. App'x 393, 395 (5th Cir. 2008) ("A mere assertion of innocence is not sufficient to contradict the defendant's sworn admission of guilt at a plea hearing.").

The defendant argues that he did not believe that the shotgun functioned at all; he purportedly received it as a gift more than 30 years ago.  Mr. Jennings points out that the case agent did not himself determine if the shotgun would fire, and instead sent the weapon to the ATF Firearms Technology Branch to be test fired.  The ATF lab was able to test fire the weapon, although one trigger was broken.  Nonetheless, Mr. Jennings asserts that he believed the shotgun was an antique that was not capable of firing.

Mr. Jennings's arguments raise two questions for the Court to consider: (1) whether the firearm was an antique; and (2) whether Mr. Jennings's belief that the firearm was a non-functioning antique, even if genuinely held, absolves him of guilt under the relevant statutes.  We find, after careful consideration, that the answer to

7

both questions is "no."

    1.    *The Firearm as an Antique*

In this motion, Mr. Jennings argues that the shotgun does not constitute a

"firearm" under two relevant provisions.  First, in the offense-specific definition, the

following exclusion appears: "The term 'firearm' shall not include an antique firearm

or any device (other than a machinegun or destructive device) which, although

designed as a weapon, the Secretary finds by reason of the date of its manufacture,

value, design, and other characteristics is primarily a collector's item and is not likely

to be used as a weapon."  26 U.S.C. § 5845(a).  Second, the more general definition of

a "firearm" in 18 U.S.C. § 921(a)(3) provides:

> The term "firearm" means (A) any weapon (including a starter gun)
> which will or is designed to or may readily be converted to expel a
> projectile by the action of an explosive; (B) the frame or receiver of any
> such weapon; (C) any firearm muffler or firearm silencer; or (D) any
> destructive device. Such term does not include an antique firearm.

To be considered an "antique," however, a firearm must possess the limited

characteristics specified by Congress:

> The term "antique firearm" means any firearm not designed or
> redesigned for using rim fire or conventional center fire ignition with
> fixed ammunition and manufactured in or before 1898 (including any
> matchlock, flintlock, percussion cap, or similar type of ignition system or
> replica thereof, whether actually manufactured before or after the year
> 1898) and also any firearm using fixed ammunition manufactured in or
> before 1898, for which ammunition is no longer manufactured in the
> United States and is not readily available in the ordinary channels of
> commercial trade.

26 U.S.C. § 5845(g).[7]

---

[7]  Title 18 contains a definition of an "antique firearm" that is substantially identical to the one
found in title 26:

The sawed-off shotgun seized from Mr. Jennings's closet does not qualify as an "antique" under either statute.  The weapon does not feature a "matchlock, flintlock, percussion cap, or similar type of ignition system," and does not fire ammunition that was made before 1898 and is not readily available for purchase.  See id.  The investigating ATF agent testified at the hearing as to the date of manufacture of the shotgun.  Although he could not reach a definite conclusion, he estimated, based upon markings on the shotgun, that it was manufactured in 1949.  The agent was able to conclusively identify the manufacturer of the shotgun, however, and he testified that the gun could not have been manufactured before the year 1915.  Therefore, the shotgun, while a relatively old weapon, would not be considered an antique under the governing statutes, and would not be exempted from the charges to which Mr. Jennings plead guilty.

### 2.    *The Scienter Requirement*

Next, the defendant states that he honestly believed the weapon to be

---

The term "antique firearm" means--
　　(A) any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; or
　　(B) any replica of any firearm described in subparagraph (A) if such replica--
　　　　(i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or
　　　　(ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; or
　　(C) any muzzle loading rifle, muzzle loading shotgun, or muzzle loading pistol, which is designed to use black powder, or a black powder substitute, and which cannot use fixed ammunition. For purposes of this subparagraph, the term "antique firearm" shall not include any weapon which incorporates a firearm frame or receiver, any firearm which is converted into a muzzle loading weapon, or any muzzle loading weapon which can be readily converted to fire fixed ammunition by replacing the barrel, bolt, breechblock, or any combination thereof.
18 U.S.C. § 921(a)(16).

inoperable, and thus, lacked the requisite scienter to be guilty of the offense.  Mr. Jennings specifies that he had never fired the weapon, and in fact, was unaware that it would fire at all.  Moreover, he claims that he did not possess any ammunition for the shotgun which could have been used to fire it.

As an initial matter, we find Mr. Jennings's claim to be highly questionable. During the plea colloquy, the element of the offense requiring that the "firearm was or could readily have been put in operating condition," was explained to Mr. Jennings. (Doc. 48, p. 14).  The defendant indicated that he understood the elements of the offense, and continued with his guilty plea.  (Doc. 48, p. 14).  Throughout his plea colloquy, Mr. Jennings also repeatedly indicated that he was guilty of the charged offense, and that his plea was entirely free and voluntary.  (Doc. 48, pp. 12, 17, 25-26). In spite of Mr. Jennings's own admissions, however, we will proceed on the assumption that he honestly believed the shotgun to be inoperable.

The statute itself provides no guidance as to what scienter may be required. In a case involving a defendant's possession of a sawed-off shotgun, however, the Fifth Circuit described the scienter requirement of 26 U.S.C. § 5861(d) in this way:

> In order to plead guilty, [the defendant] did not have to know it was against the law to possess the weapon or even that there was a registration requirement; instead, he needed only to possess the weapon and know it was less than 26 inches or that its barrel less than 18 inches. Moreover, the government does not have to show knowledge of the law in order to obtain a conviction under section 5861(d).

United States v. Reyna, 130 F.3d 104, 111 n.8 (5th Cir. 1997) (citing Staples v. United States, 511 U.S. 600 (1994)).  Thus, although the statute is silent regarding a mens rea element, Supreme Court interpretations of the statute require that the defendant

10

must merely "'know of the particular characteristics that make his weapon a statutory firearm.'" Id. at 109 (quoting Staples, 511 U.S. at 609).

Moreover, the scienter requirement applies equally to sawed-off shotguns (the unlawful characteristics of which may be readily apparent), and to machineguns (the unlawful characteristics of which may not be apparent). Id. at 108-09. Those characteristics are: (1) under 26 U.S.C. § 5845(a)(1), a "firearm" constituting a "shotgun having a barrel or barrels of less than 18 inches in length"; and (2) under 26 U.S.C. § 5845(d), a "shotgun" which includes "any such weapon which may be readily restored to fire a fixed shotgun shell."

Clearly, a sawed-off shotgun which is damaged or temporarily non-functional, but which could readily be made operable, is a statutory "firearm." See id. In United States v. Ridlehuber, the court affirmed a defendant's conviction under § 5861(d) for possession of an unregistered sawed-off shotgun, despite the fact that the hammer on the weapon was broken off. 11 F.3d 516, 519-20, 527 (5th Cir. 1993). The court did not discuss this defect in the context of a scienter requirement, but rather simply noted that the gun could be cocked and fired using a tool such as a screwdriver, and upheld the conviction. See id.[8] Similarly, in the context of 18 U.S.C. §§ 922-924, prohibiting possession of a firearm by a felon, the court held that it was irrelevant whether a rifle possessed by a felon was capable of firing, because "[a]n inoperable

---

[8] Other circuits have also held that a conviction under § 5861(d) does not require a functional weapon. See United States v. Goff, No. 07-2998, 2009 WL 50191, at *1 (8th Cir. Jan. 9, 2009) (finding it immaterial that an unregistered shotgun was "temporarily inoperable"); United States v. Yannott, 42 F.3d 999, 1006-07 (6th Cir. 1994) (holding that a shotgun with a broken firing pin was nonetheless a "firearm" within the meaning of 26 U.S.C. § 5845, because it could be "readily restored" to fire a shell).

firearm is nonetheless a firearm." United States v. Perez, 897 F.2d 751, 754 (5th Cir. 1990).

In this case, the shotgun was damaged or at least partially inoperable. Evidence before the Court indicates that one of the shotgun's two triggers had been broken off, and subsequently taped to the side of the firearm. However, the firearm was also partially operable, or at least in such a condition that it could be made operable with minimal effort. The shotgun was successfully test fired with minimal effort; a shell was fired from the unbroken barrel without incident. Thus, the shotgun would certainly be considered a firearm under the statute.

The question of whether the defendant *must have known or believed* that the gun was *operable*, however, does not seem to have been squarely addressed by the Fifth Circuit. But the D.C. Circuit has held that a defendant's belief that a sawed-off shotgun was inoperable was irrelevant to his guilt under § 5861(d). United States v. Foster, 19 F.3d 1452, 1453-54 (D.C. Cir. 1994) (affirming a defendant's conviction despite his claim that he believed the weapon to be inoperable, because the shortened barrel length was an obvious feature of the weapon, and knowledge of that feature is all that is required to convict under the statute). The Ninth Circuit, on the other hand, recognizes an exception to the rule that knowledge is not a required element under § 5861, "where a firearm is inoperable and obviously not dangerous." United States v. Evans, 978 F.2d 1112, 1114 (9th Cir. 1992).

The only guidance offered by the Fifth Circuit in Reyna, does not require that a defendant believe the weapon to be operable, *per se* - only that he know of the

12

characteristics which make it a statutory "firearm." See 103 F.3d at 109.  According to the sworn statements given by Mr. Jennings during his guilty plea, he knew that the weapon had a shortened barrel, and that it was or could easily be made operable - in short, he knew everything about the shotgun which makes it a statutory "firearm."  These statements alone would be sufficient to sustain his guilty plea under the binding precedents in our jurisdiction.

Even if we look beyond the Fifth Circuit's limited guidance on the issue of scienter, however, Mr. Jennings's arguments find little support.  As we have stated, some courts have flatly rejected a defendant's claim to innocence under § 5861(d) because of a belief that a firearm was inoperable. See Foster, 19 F.3d at 1453-54.  By this standard, then, Mr. Jennings's honest belief that his shotgun would not fire is completely irrelevant.  Mr. Jennings could not rely upon the Ninth Circuit's more flexible standard either, because the shotgun seized from his closet was neither "inoperable" in fact, nor "obviously not dangerous." See Evans, 978 F.2d at 1114. While relatively old, and perhaps partially broken, there is no indication that the operable barrel of Mr. Jennings's shotgun did not appear to be dangerous.  Rather, that barrel was functional, dangerous, and visibly undamaged.

Therefore, the Court finds that Mr. Jennings's claim to actual innocence based upon a scienter requirement must fail.

### D.   Ineffective Assistance of Counsel Based Upon the Failure to File and/or Advise the Defendant of the Viability of a Motion to Suppress

#### 1.   *General Standards*

In the most recent iteration of the motion (Doc. 51), defense counsel contends

that the defendant's plea was not voluntary because the public defender rendered ineffective assistance.  The familiar two-pronged standard of ineffective assistance of counsel claims requires the defendant to establish (1) "that counsel's performance was deficient"; and (2) "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687 (1984).  Defense counsel's performance must have fallen below "an objective standard of reasonableness" to be considered ineffective, and there is a strong presumption against this conclusion.  Id. at 688-89. Moreover, when the crux of the ineffective assistance claim involves defense counsel's failure to file a motion to suppress evidence, "'the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.'"  United States v. Alanis, 88 F. App'x 15, 18 (5th Cir. 2004) (quoting Kimmelman v. Morrison, 477 U.S. 365, 375 (1986)).

Mr. Jennings's assertion of his Fourth Amendment rights would normally be untimely, because he waived his right to challenge evidentiary matters by pleading guilty.  The Fifth Circuit has held that "[a] plea of guilty admits all the elements of a formal criminal charge and waives all non-jurisdictional defects in the proceedings leading to conviction."  United States v. Smallwood, 920 F.2d 1231, 1240 (5th Cir. 1991).  Thus, when a defendant enters an unconditional and voluntary guilty plea, he waives the right to seek suppression of evidence that may have been obtained as a result of an unlawful search under the Fourth Amendment.  United States v. Cothran,

14

302 F.3d 279, 285-86 (5th Cir. 2002) ("A guilty plea also eliminates objections to searches and seizures that violate the Fourth Amendment."); see United States v. Stevens, 487 F.3d 232, 238 (5th Cir. 2007); United States v. Wise, 179 F.3d 184, 186 (5th Cir. 1999).  No motion to suppress the evidence has ever been filed in the case, and Mr. Jennings's plea was not conditional.  Thus, on face, Mr. Jennings voluntarily waived his right to challenge the prospective admission of evidence on Fourth Amendment grounds.

In this motion, however, the defendant seeks to prove that his guilty plea was involuntary because his first appointed attorney was ineffective in failing to file or advise him of the viability of a motion to suppress the sawed-off shotgun.  Broadly, counsel may be ineffective by neglecting or refusing to file a viable motion to suppress.  See United States v. Gibson, 55 F.3d 173, 179 (5th Cir. 1995).  However, counsel is not automatically ineffective by failing to file such a motion, as the decision may be a strategic one.  United States v. Chavez-Valencia, 116 F.3d 127, 133-34 (5th Cir. 1997).   The Fifth Circuit has held that an ineffective assistance of counsel claim based upon failure to file a suppression motion "cannot be reviewed without testimony as to the reasons behind failing to file the motion."  United States v. Maria-Martinez, 143 F.3d 914, 916 (5th Cir. 1998).[9]

Here, the ineffective assistance claim is intertwined with the defendant's contention that his plea was not voluntary.  Mr. Jennings asserts that he would not

---

[9]  Although we consider the instant motions outside of the traditional ineffective assistance of counsel context, we nonetheless insisted upon hearing testimony from Mr. Jennings's first attorney at the November 5, 2009 hearing.

have pled guilty had he known that a motion to suppress the shotgun may have been successful. The standard for assessing the voluntariness of a defendant's guilty plea, in light of defense counsel's advice, is as follows:

> [Defense counsel must] actually and substantially assist his client in deciding whether to plead guilty. It is his job to provide the accused an understanding of the law in relation to the facts. The advice he gives need not be perfect, but it must be reasonably competent. His advice should permit the accused to make an informed and conscious choice. In other words, if the quality of counsel's service falls below a certain minimum level, the client's guilty plea cannot be knowing and voluntary because it will not represent an informed choice. And a lawyer who is not familiar with the facts and law relevant to his client's case cannot meet that required minimal level.

United States v. Cavitt, 550 F.3d 430, 440-41 (5th Cir. 2008). By pleading guilty, the defendant *does not* waive the right to challenge the effectiveness of his attorney in advising him to plead guilty. Id. at 441. Moreover, to succeed on an ineffective assistance claim in the context of a guilty plea, the defendant must establish "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Bond v. Dretke, 384 F.3d 166, 167-68 (5th Cir. 2004).

The result of this rather long analysis is that, in order to justify the motion to withdraw his guilty plea, Mr. Jennings must prove the following: (1) that his original attorney was deficient in failing to file and/or advise him of the viability of a motion to suppress, i.e. that there was, in fact, a viable motion to suppress in his case; and (2) that, had he known that a motion to suppress was viable, he would not have plead guilty, but instead, would have insisted on going to trial.

Because there was no viable motion to suppress in this case, and because Mr.

16

Jennings's first attorney considered, presented to Mr. Jennings, and dismissed the prospect of filing such a motion, the Court finds that counsel was not deficient, and that Mr. Jennings's plea was knowing and voluntary.

2.   <em>Viability of a Motion to Suppress</em>

Mr. Jennings argues that the shotgun was seized during an unlawful warrantless search of his residence. He claims that he was arrested in his front yard, but that the weapon was recovered from a closet inside of his residence. This search, he argues, exceeded the proper scope of a search incident to an arrest. The government, however, contends that the search was conducted as a "protective sweep" following the defendant's threatening behavior toward police officers, and thus, that the evidence was lawfully discovered. (Doc. 49, p. 10).

The United States Supreme Court described the general standards governing "protective sweeps" in Maryland v. Buie:

> [A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

494 U.S. 325, 334 (1990). The Court did specify, however, that a protective sweep is not a <em>de minimus</em> intrusion into an individual's privacy, and therefore, the search must be limited (1) in extent, to "a cursory inspection of those spaces where a person may be found"; and (2) in duration, to a period of time which "lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer

17

than it takes to complete the arrest and depart the premises." Id. at 335-36; accord
United States v. Maldonado, 472 F.3d 388, 393 (5th Cir. 2006).

The search in this case followed a "standoff" between police officers and Mr.
Jennings.  The standoff was precipitated by a phone call to the police in which the
caller stated that Mr. Jennings was threatening to harm himself in some way.  Police
officers responded, and when officers arrived on the scene and encountered Mr.
Jennings, he displayed a weapon and threatened to kill the officers.  SWAT team
members were then called to the scene.  At one point during the standoff, Mr.
Jennings exited his residence carrying a weapon and waving it in the direction of the
officers.  He then put the weapon down, and walked back into the residence.

When Mr. Jennings finally  surrendered to officers, he walked out of the home,
unarmed, with his hands in the air.  He was detained in his front yard, and had
already been arrested and placed in handcuffs at the time the sweep was conducted.
Officers did not obtain a warrant before entering the residence, and the search
uncovered no one else inside.  Of course, what it did uncover was approximately ten
weapons, including the sawed-off shotgun at issue in this case.

There is ample evidence before the Court that the officers had reason to
suspect that other people could possibly have been inside of the residence.[10]  During
the standoff, lights were going on and off inside.  Officers and snipers could see

---

[10] At the hearing, defense counsel highlighted testimony from some witnesses that there is
"always a possibility" that someone else could be inside of a residence after an arrest like the one in
this case.  While we recognize counsel's point here, our discussion in this ruling will focus upon the
more specific facts which caused these witnesses to suspect that another individual could have been
in Mr. Jennings's residence.

movement behind curtains, although they were not able to actually see inside of the house. These activities were taking place on both floors of the residence. Thus, while the officers could not be *certain* that the movement inside of the house was caused by a second individual, they could not *discount* that possibility either.[11]

Once officers entered the residence, the Court heard testimony that the search was very brief - it took a matter of minutes before officers swept the entire residence and considered it secure. During the sweep, officers uncovered the sawed-off shotgun on a shelf in a closet, near another shotgun, and (according to officers) in plain view. The closet was purportedly checked to ensure that no individuals were hiding inside. While defense witnesses, including Mr. Jennings, testified at the hearing that the gun was wrapped in a sheet out of plain sight, officers stated that the weapon was discovered in plain view. Therefore, the protective sweep in this case was properly limited in scope and duration. Buie, 494 U.S. at 334.

Counsel for the defendant indicates that it would have been possible for the officers to maintain the perimeter around the residence, and to obtain a search warrant before entering. However, it is well-settled that "officers are not required to [obtain a search warrant] as soon as it is practicable to do so." United States v. Ibarra-Sanchez, 199 F.3d 753, 759 (5th Cir. 1999) (citing United States v. Carrillo-Morales, 27 F.3d 1054, 1063 (5th Cir. 1994)). Contrary to defense counsel's arguments, there was good cause for urgency in performing the sweep. While the

---

[11] Intelligence reports from neighbors indicated that Mr. Jennings may have had a number of high-powered assault rifles inside the carport or the residence as well. The possible presence of a large number of weapons in the home with other individuals reasonably played a role in the officers' decision to conduct the sweep.

residence was basically surrounded with officers, there was still a threat that other individuals remained hiding inside the home, armed with high-powered weapons. There was also a possibility that someone had been injured inside of the residence, and was in need of medical attention.

Given the volatility of the standoff situation, the large number of weapons that officers believed to be inside Mr. Jennings's residence, the lack of full visibility, and the extensive activity on both floors during the standoff, we find more than enough "articulable facts" to justify the protective sweep in this case. See Buie, 494 U.S. at 334. While officers could not be certain (and had no independent information) that another person was inside, certainty is not the standard required by the law. The sweep was reasonable, well-founded under the circumstances, and thus, legally permissible. A motion to suppress the shotgun, if one had been filed by the public defender, very likely would not have been granted.

3.    *Counsel's Overall Performance*

Finally, we will consider more generally whether the public defender's representation of Mr. Jennings was constitutionally adequate. We note that our "scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689. As to strategic decisions, such as the one not to file a motion to suppress in this case, counsel must merely "make an informed decision that certain avenues will not be fruitful." United States v. Conley, 349 F.3d 837, 841 (5th Cir. 2003) (quoting United States v. Phillips, 210 F.3d 345, 348 (5th Cir. 2000)). Moreover, "[a]n attorney undoubtedly has a duty to consult with the client regarding 'important decisions,'

including questions of overarching defense strategy." <u>Florida v. Nixon</u>, 543 U.S. 175, 187 (2004) (quoting <u>Strickland</u>, 466 U.S. at 688).[12]

The defendant testified at the hearing that the first time that he had heard the phrase "suppression of the evidence" was when his new counsel mentioned it to him after his guilty plea.  In other words, Mr. Jennings claims that he never discussed with his first attorney the possibility of filing a "motion to suppress the evidence" against him before entering his guilty plea.

We have already determined that such a motion would have been fruitless. "An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue." <u>United States v. Kimler</u>, 167 F.3d 889, 893 (5th Cir. 1999).  However, for the sake of completeness, we will analyze the defendant's claim in full.

To begin, the public defender testified that he considered filing a motion to suppress, and discussed with Mr. Jennings the fact that, although he wished that he could in somehow "do away" with the shotgun as evidence in the case, he did not believe that to be possible.  While he may not have used the exact phrase "motion to suppress evidence," the public defender did inform his client that it was not possible, in his professional judgment, to prevent the evidence from being used at trial.  Again,

---

[12] While the Court's review is necessarily deferential, we are "'not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all.'" <u>Koon v. Cain</u>, 277 F. App'x 381, 386 (5th Cir. 2008) (quoting <u>Moore v. Johnson</u>, 194 F.3d 586, 604 (5th Cir. 1999)).

he was very likely correct in this assessment, and in predicting that the evidence would likely be devastating at trial.  Thus, the public defender satisfied his "duty to advise the defendant of the available options and possible consequences" before a guilty plea was entered.  Beckham v. Wainwright, 639 F.2d 262, 267 (5th Cir. 1981).

In addition, we find that the public defender reached this judgment on an informed basis.  The public defender is a licensed attorney with more than two decades of experience in criminal law.  At the hearing, he testified that he visited Mr. Jennings on numerous occasions, and thoroughly reviewed the government's evidence as well as the state district attorney's file on the case.  After conducting his investigation and conferring with officials in the district attorney's office, the public defender advised Mr. Jennings that he believed the shotgun would be used against him at trial, and that he would very likely be convicted of the offense.  He further advised Mr. Jennings that the better strategy would be to plead guilty and obtain a benefit at sentencing for accepting responsibility.  These acts not only fail to show any risk of error or prejudice to Mr. Jennings under Strickland, but they are routine and logical steps in a criminal defense of this nature.  We find no apparent flaw in the public defender's conduct whatsoever.

## III.   Conclusion

In deciding this motion, the Court has properly afforded Mr. Jennings the benefit of the doubt at every appropriate juncture, including the opportunity to present evidence at a live hearing.  We reviewed the record thoroughly, bearing in mind the critical importance of a person's decision to plead guilty, and to retract that

22

decision if possible.  Ultimately, we do not find any legally sufficient grounds upon which Mr. Jennings may be entitled to withdraw his guilty plea.

Therefore, Mr. Jennings's motions to withdraw his guilty plea (Docs. 43, 51) are hereby **DENIED**.

SIGNED on this 23rd day of December, 2009 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE